1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BYRON BATES,

          Plaintiff,

    v.

KING COUNTY, *et. al.*,

          Defendants.

CASE NO.  C05-1348RSM

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.  INTRODUCTION

      This matter comes before the Court on defendants' Motion for Summary Judgment.  (Dkt. #21).  Defendants argue that plaintiff's civil rights claims should be dismissed because Deputies Houck and Hanson did not violate plaintiff's rights under the Fourth Amendment, and they are protected by qualified immunity in any event.  Defendants further move to dismiss plaintiff's state law claims, as well as his municipal liability claim.

      Plaintiff responds that summary judgment is not appropriate in light of conflicting factual accounts of the incident at issue.  (Dkt. #40).  Plaintiff further argues that none of the officers are entitled to qualified immunity because there is a question of fact as to whether the deputies violated his rights.  Finally, plaintiff argues that his remaining claims should not be dismissed because there are genuine issues of material fact that preclude summary judgment.

MEMORANDUM ORDER
PAGE - 1

1    For the reasons set forth below, the Court agrees with plaintiff in part and defendants in part,

2    and therefore GRANTS IN PART and DENIES IN PART defendants' motion for summary

3    judgment.

4    **II.  DISCUSSION**.

5    **A.  Background**

6    This lawsuit arises from events occurring on June 4, 2003, when Byron Bates was involved in

7    a pedestrian traffic stop that eventually resulted in a forceful arrest.  The facts surrounding the stop

8    and the arrest are largely in dispute.[1]

9    On the evening of June 3, 2003, plaintiff and his brother, Kristopher, and a friend went to

10   Bishop's Pub, located on Vashon Highway, on Vashon Island, to play pool and relax after work.

11   While they were there, plaintiff consumed one gin and tonic and one glass of beer from a shared

12   pitcher.  They were at the tavern for approximately one hour, and then left for home shortly after

13   midnight.

14   Because the friend who had driven them to the tavern did not want to drive them home,

15   plaintiff and his brother decided to walk.  They met up with two other individuals outside the tavern

16   and began to walk south on Vashon Highway.  They walked with their backs toward the traffic.

17   Plaintiff walked on the inside of the roadway closest to the white "fog line."  Plaintiff claims that they

18   hitchhiked as they walked, and that when a vehicle would appear, he would turn and face traffic and

19   put out his thumb.

20   At some point a white van drove past with a Mr. and Mrs. Arteaga inside.  Mr. Arteaga

21   contends that he suddenly had to slam on his brakes to avoid hitting one of the men in the road.  He

22   also contends that he could not go around the men because there was another car in the oncoming

23   lane. Mr. Arteaga eventually passed, honking and yelling at the men.  The Arteagas state that the

24

25   [1] To the extent that there is a difference between the parties' versions of events, the Court views
26   the facts most favorably to the non-moving party.

MEMORANDUM ORDER
PAGE - 2

1   man in the road was swearing at them and acted like he was going to hit their car with his fist when

2   they drove by.  Plaintiff and his brother assert that none of them were in the road, and they merely

3   signaled the Arteagas for a ride.

4        In any event, the Arteagas apparently drove a short distance where they saw King County

5   Sheriff's Deputy Jason Houck at a gas station.  The Arteagas stopped and told Deputy Houck what

6   had happened.  Deputy Houck then drove north on Vashon Highway where he encountered the four

7   males.  According to plaintiff, when he saw Deputy Houck, he started to walk toward the vehicle,

8   but Deputy Houck told him to wait where he was.  Deputy Houck then cut across the southbound

9   lane and pulled over.  He asked everyone where they were headed, where they were coming from,

10  and requested identification ("ID").  Deputy Houck then returned to his patrol car to check the IDs

11  he had been given.  There is no dispute by any party that, up until this point, the encounter was

12  harmless and routine.

13       According to plaintiff, when Deputy Houck returned from his vehicle, he informed the men

14  that he was going to ticket them for walking in the roadway.  He then apparently informed them that

15  they could leave, but that they would have to leave their licenses and they could pick them up, along

16  with their citations, in the morning at the local substation.  Plaintiff and his brother started to get

17  agitated because they knew they had clean records and did not understand why they could not get

18  their licences and leave.  Plaintiff asked for the return of his ID, and Deputy Houck asked him to

19  come back over and have a seat.  Plaintiff was angry because he had just been told he could leave,

20  and then it appeared to him that the Deputy was trying to hold him there again.  Apparently, Deputy

21  Houck then began to approach plaintiff and his brother, and they started to back away.[2]  Plaintiff

22  asserts that Deputy Houck reached out and grabbed his brother's jacket, but Kristopher spun away

23

24       [2] Deputy Houck explains that during this time he had been getting very frustrated.  He had

25  attempted to verify the IDs he had been give, but could not, because his radio was malfunctioning – a
    common occurrence on Vashon Island.  He was also frustrated that the four men were arguing with him

26  "getting up" in his face.

MEMORANDUM ORDER
PAGE - 3

1    and managed to get free.  Deputy Houck then called for backup.  As he again tried to approach

2    plaintiff and his brother, they continued to back up and separate so that Deputy Houck could not

3    reach either of them.  They continued to argue about the return of their licenses.

4           Shortly thereafter, another patrol car approached from the north, driven by King County

5    Sheriff's Deputy Jason Hanson.  Deputy Hanson arrived, exited his vehicle, and shouted, "get the

6    fuck down!"  Plaintiff and his brother apparently tried to "settle down" Deputy Hanson, and plaintiff

7    started walking back toward Deputy Houck's car.  According to plaintiff, chaos ensued.  Deputy

8    Houck began to place plaintiff under arrest.  He leaned plaintiff over the front of his patrol car and

9    began to handcuff him behind his back.  Plaintiff was struggling, and then he saw Deputy Hanson hit

10   his brother, and his brother fall down.  Plaintiff was able to break free from Deputy Houck, and he

11   tried to run over to his brother.  Deputy Hanson then tasered plaintiff.  The parties agree that plaintiff

12   was tasered at least once.  Plaintiff then asserts that he fell to the ground and Deputy Hanson

13   immediately came over and kicked him three times in the face, resulting in a broken jaw.[3]  This

14   lawsuit followed.  Plaintiff initially filed his case in King County Superior Court.  It was subsequently

15   removed here by defendants.[4]  In his Complaint, plaintiff raises several claims for relief pursuant to

16   42 U.S.C. § 1983.  Specifically, plaintiff alleges that the officer defendants violated his Fourth

17   Amendment rights by seizing him unlawfully, and by using excessive force during his arrest.  Plaintiff

18   further alleges that defendants King County and King County Sheriff's Department have municipal

19   liability for negligently hiring, training, supervising and/or retaining defendant Deputies.  Plaintiff also

20   alleges a number of state law claims, including: (1) assault and battery; (2) false arrest/unlawful

21   imprisonment; (3) negligent infliction of emotional distress; (4) intentional or reckless infliction of

22

23         [3] The Deputies recount a different scene, asserting that plaintiff and his brother were the
     aggressors, and explaining that plaintiff's jaw was broken by accident while Deputy Hanson attempted to
24   immobilize his left arm.  Other witness accounts describe rapidly escalating violence by the deputies with
     no provocation by plaintiff or his brother.

25         [4] The Court notes that Deputy Hanson is now a police officer in Las Vegas, and Deputy Houck is
26   now contracted with the City of Burien through the King County Sheriff's Department.

MEMORANDUM ORDER
PAGE - 4

1    emotional distress/outrage; and (5) negligent hiring, training, supervising and retention.

2    **B. Summary Judgment Standard**

3    Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

4    and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

5    any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

6    P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The Court must draw all

7    reasonable inferences in favor of the non-moving party.  *See F.D.I.C. v. O'Melveny & Meyers*, 969

8    F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994).  The moving party has

9    the burden of demonstrating the absence of a genuine issue of material fact for trial.  *See Anderson*,

10    477 U.S. at 257.  Mere disagreement, or the bald assertion that a genuine issue of material fact

11    exists, no longer precludes the use of summary judgment.  *See California Architectural Bldg.*

12    *Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

13    Genuine factual issues are those for which the evidence is such that "a reasonable jury could

14    return a verdict for the non-moving party."  *Anderson,* 477 U.S. at 248.  Material facts are those

15    which might affect the outcome of the suit under governing law.  *See id.*  In ruling on summary

16    judgment, a court does not weigh evidence to determine the truth of the matter, but "only

17    determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549

18    (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).  Furthermore, conclusory or

19    speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment.

20    *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).

21    Similarly, hearsay evidence may not be considered in deciding whether material facts are at issue in

22    summary judgment motions.  *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F. 2d 665, 667 (9th Cir.

23    1980).

24

25    **C.  Motions to Strike**

26

MEMORANDUM ORDER
PAGE - 5

As an initial matter, the Court first addresses defendants' request to strike certain materials, including the declaration of Denise Scaffidi filed in support of plaintiff's opposition, excerpts from a report from the king County Sheriff's Blue Ribbon Panel filed in support of plaintiff's opposition, and the declaration and report of Lee Libby filed in support of plaintiff's opposition. The Court has reviewed the materials at issue, and finds as follows:

### 1. Scaffidi Declaration

Defendants ask the Court to strike the declaration of Denise Scaffidi on the basis that she has never been disclosed as a witness, she reports improper opinion evidence, and her declaration lacks foundation. Ms. Scaffidi was apparently hired by plaintiff as an investigator, and her declaration, based on her experience as a long time resident of Vashon Island, describes the general area where the incident at issue in this case took place. Plaintiff does not rely upon the information in any substantive manner in his opposition. Indeed, plaintiff cites to the declaration only once as support for his description of the Vashon Highway. (*See* Dkt. #40 at 2). Further, this Court does not rely upon Ms. Scaffidi's declaration in its discussion below. Accordingly, the Court DENIES defendants' motion to strike as moot.

### 2. Excerpts from the Blue Ribbon Panel Report

Defendants next ask the Court to strike Exhibit 8 to plaintiff's counsel's declaration, which contains a copy of the Report of the King County Sheriff's Blue Ribbon Panel, on the basis that it is hearsay, irrelevant, lacks foundation and lacks authenticity. The Court agrees with defendants. Accordingly, the Court GRANTS defendants' motion to strike, and will not consider the excerpts of the report cited in support of plaintiff's opposition to summary judgment.

### 3. Declaration and Report of Lee Libby

Finally, defendants ask the Court to strike Exhibit 10 to plaintiff's counsel's declaration, which is a declaration and report from plaintiff's police practices expert, Lee Libby. This expert was the subject of a motion to exclude, previously brought by defendants. This Court has since ruled on

MEMORANDUM ORDER
PAGE - 6

1    that motion, and has declined to exclude Mr. Libby's expert testimony.  (Dkt. #53).  On this motion,

2    defendants essentially repeat the same arguments as set forth in their previous motion to exclude;

3    thus, to the extent that the arguments remain the same, the Court DENIES defendants' motion to

4    strike for the same reasons it denied their motion to exclude.  The Court also DENIES defendants'

5    motion to strike on the basis that the Court is able to determine which portions of the declaration and

6    report constitute proper evidence, and will rely only on those portions, if necessary, in making its

7    determination below.

8        **D.  § 1983 Civil Rights Violations**

9        The Court now turns to plaintiff's allegations against the individually-named Deputies.  As

10   noted above, plaintiff alleges that the individual defendants violated his civil rights under 42 U.S.C. §

11   1983 by unlawfully seizing him, and by using excessive force during his arrest.  To prevail on these

12   claims, plaintiff must prove that defendants acted under color of law and deprived plaintiff of a

13   constitutionally-protected right.  42 U.S.C. § 1983; *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082

14   (9th Cir. 1998) (citing *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).  To successfully

15   defend against summary judgment, plaintiff must demonstrate that there is a genuine issue of material

16   fact as to whether defendants unlawfully stopped and detained him, whether he was unlawfully

17   arrested, and whether reasonable force was used during plaintiff's arrest.  The Court addresses each

18   of these issues in turn.

19            *1.  Initial Stop*

20       Defendants first argue that they had reasonable suspicion to stop plaintiff because Deputy

21   Houck witnessed him walking with his back to traffic.  Washington law mandates that, when

22   practicable, pedestrians moving along a highway shall walk or move only on the side facing traffic.

23   RCW 46.61.250(2).  Washington law also gives law enforcement officers the authority to stop and

24   detain persons for traffic infractions.  RCW 46.61.021.  Plaintiff admits that he was walking with his

25   back toward traffic.  However, plaintiff argues that summary judgment as to whether the initial stop

26

was lawful is not appropriate because there is a question of fact as to whether walking on the left

side of the road was practicable in this case.  The Court is not persuaded by either defendants' or

plaintiff's arguments, but finds that Deputy Houck's initial stop was lawful for other reasons –

namely, because the United States Supreme Court has been clear that "law enforcement officers do

not violate the Fourth Amendment by merely approaching an individual on the street or in another

public place, by asking him if he is willing to answer some questions, [or] by putting questions to him

if the person is willing to listen . . . ".  *Florida v. Royer*, 460 U.S. 491, 497 (1983).  In this case,

plaintiff admits that his initial interactions with Deputy Houck were routine and harmless, and

plaintiff appears to have voluntarily answered Deputy Houck's questions as they were put to him.

Thus, the Court turns to the question of whether the scope of the stop was lawful.

> *2.  Scope of Stop*

Defendants argue that plaintiff's detention did not exceed its lawful scope because plaintiff

and his brother chose to leave without their licenses before Deputy Houck could issue a citation.

Plaintiff argues that the scope of the stop was not lawful because:

> [t]he manner in which this stop was conducted went beyond what is permitted for
> a pedestrian infraction.  The length of the detention was not appropriately limited
> when Deputy Houck announced that the driver's licenses would be retained.

(Dkt. #40 at 16).

"Whenever a police officer accosts an individual and restrains his freedom to walk away, he

has 'seized' that person."  *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  The Fourth Amendment requires

that the seizure be "reasonable."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

Police may not detain a person "even momentarily without reasonable, objective grounds for doing

so."  *Royer*, 460 U.S. at 498.  The Ninth Circuit Court of Appeals has explained that, under *Terry*,

the length and scope of a detention must be "'strictly tied to and justified by' the circumstances

which rendered its initiation permissible."  *United States v. Luckett*, 484 F.2d 89, 90 (9th Cir. 1973)

(citation omitted).  "This standard permits a police officer to detain an individual stopped for [a

1    pedestrian traffic infraction] only [for] the time necessary to obtain satisfactory identification from

2    the violator and to execute a traffic citation." *Id.* at 91.

3         Here, there is no indication that Deputy Houck stopped plaintiff and his companions for any

4    reason other than that they were walking with their back toward traffic and, according to Deputy

5    Houck, because plaintiff was skipping down the middle of the road.  Deputy Houck has not

6    articulated any suspicion of criminal activity by any of the men, nor has he articulated any reason to

7    suspect that the IDs provided were invalid.  Indeed, Deputy Houck admitted that he had no suspicion

8    that the IDs were suspicious in any way.  (Dkt. #41, Ex. 5 at 88-89).  More importantly, Deputy

9    Houck admits that he did not give permission for them to leave.  He states that he was probably

10   yelling, or speaking in an animated voice, telling them they could not just leave, "that's not how this

11   works," and that they needed to just sit there and wait.  (Dkt. #41, Ex. 5 at 88).

12        Plaintiff testified that, initially, he understood that Deputy Houck wanted him to "sit tight"

13   while the Deputy finished talking to the two individuals who were with him.  (Dkt. #22, Ex. 1 at 71).

14   However, plaintiff wanted to go home, so he asked for his ID back so he could leave.  Plaintiff states

15   that Deputy Houck refused to return the ID at that point, but said he could leave and pick up his ID

16   and citation in the morning.  Plaintiff again stated that he wanted his ID so he could drive to school

17   the next morning, and states that Deputy Houck responded, "come back over here and have a seat."

18   (Dkt. #22, Ex. 1 at 73).  Plaintiff testified that he began to argue with the Deputy about his refusal to

19   give their licenses back.

20        Kristopher Bates testified that after the Deputy informed them that he was going to issue

21   tickets for walking in the road, he made the decision to leave without his license because he was tired

22   and frustrated at how long the detention was taking.

23        I started to just like get frustrated, you know.  It just seemed ridiculous to me.  I
          had to work the next morning.  I was already tired.  I had not wanted to go out

24        that night anyway really.  And so I – you know, I basically said, "Wow.  You
          know, this is ridiculous.  You know, fine.  I'm going to keep going home.  You've

25        got my address.  I've already told you where I live, but I'm tired.  And this has
          already been a longer night than I wanted."

26

MEMORANDUM ORDER
PAGE - 9

> And I started to walk towards home to continue on. He still had my license and stuff. And he basically said, "fine, you can pick up your license and your ticket – your licenses and your tickets in the morning," but he said, "Go ahead and go home."

(Dkt. #22, Ex. 2 at 19-20). However, Kristopher testifies that after plaintiff tried to get his license and then gave up and started to leave, Deputy Houck apparently said, "No, I think you guys need to stay here." Kristopher then began to argue with the Deputy, asking for a legal reason why they should remain. Eventually, Deputy Houck told them it was because they were walking with their backs toward traffic. (Dkt. #22, Ex. 2 at 20-21).

Similarly, one of the other men who was with plaintiff that night, Austin Stone, testified that it was his understanding that Deputy Houck intended to keep their licenses for the night, and that Deputy Houck kept telling them they could pick them up in the morning. (Dkt. #41, Ex. 4 at 59-60).

On these facts, the Court cannot say with certainty that Deputy Houck's detention was "strictly tied to and justified by" the circumstances which caused him to stop plaintiff in the first place. Accordingly, the Court agrees with plaintiff that summary judgment is not appropriate.

### 3. Lawfulness of Arrest

Defendants next argue that plaintiff's arrest was lawful. Plaintiff was arrested for violating three Washington state statues: RCW 9A.76.020 (obstructing a police officer); RCW 9A.36.050 (reckless endangerment); and RCW 9A76.040 (resisting arrest). Washington law authorizes law enforcement officers to execute warrantless arrests if the officer has probable cause to believe the person is committing, or has committed, a felony, or if a misdemeanor or gross misdemeanor has been committed in his presence. RCW 10.31.100(3). The United States Supreme Court has explained that a warrantless arrest of an individual for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause. *United States v. Watson*, 423 U.S. 411, 424 (1976); *see Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth

MEMORANDUM ORDER
PAGE - 10

Amendment, arrest the offender").  To determine whether an officer had probable cause to arrest an individual, the Court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation omitted).

In the instant case, plaintiff admits that he was attempting to leave the scene, ignoring Deputy Houck's instruction to wait for him to issue a citation.  That caused Deputy Houck to abandon his efforts to write and distribute citations to plaintiff, as well as the others present, while he attempted to secure plaintiff's movements.  The Court agrees that plaintiff's actions gave Deputy Houck probable cause to arrest plaintiff under RCW 9A.76.020.  *State v. Little*, 116 Wn.2d 488, 496 (1991) (holding that flight from the police constituted obstruction of a police officer in the exercise of his official duties).  Because the Court finds that plaintiff's arrest for obstructing a police officer was lawful, it need not determine whether there was probable cause for the second charge of reckless endangerment.  *See Barry v. Fowler*, 902 F.2d 770, 773 n.5 (9th Cir. 1990) (explaining that when there is one arrest for multiple crimes, and the Court determines there was probable cause for one of the charges, it does not matter whether there was probable cause for the other charges).  Accordingly, the Court agrees with defendants that plaintiff's arrest does not violate the Fourth Amendment.

### 4. Excessive Force

The Court now turns to whether Deputy Hanson used excessive force in arresting plaintiff.  A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  In that case, the court instructed that all claims that law enforcement officers have used excessive force in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard.  *See Graham*, 490 U.S. at 395; *Smith v. City of Hemet*, 394 F. 3d 689, 700 (9th Cir. 2005); *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (as amended).  That analysis requires balancing the "nature and quality

MEMORANDUM ORDER
PAGE - 11

of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Graham*, 490 U.S. at 396.

The Supreme Court further instructed that "the 'reasonableness' inquiry in an excessive force case is an objective one: The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397 (citations omitted); *see, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (*en banc*) (emphasis in original).

In *Graham*, the Supreme Court stated that relevant factors in the Fourth Amendment reasonableness inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. However, the Court also noted that other factors may also be relevant to a court's inquiry. "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," the reasonableness of a seizure must instead be assessed by carefully considering the objective facts and circumstances that confronted the arresting officers. *Id.*; *Hemet*, 394 F.3d at 701. For example, the Ninth Circuit Court of Appeals has noted that, in some cases, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994).

With this guidance, the Court now turns to defendants' motion for summary judgment, also being mindful that if the evidence, reviewed in the light most favorable to plaintiff, could support a finding of excessive force, then defendants are not entitled to summary judgment. Furthermore, "[b]ecause [the excessive force inquiry] nearly always requires a jury to sift through disputed factual

MEMORANDUM ORDER
PAGE - 12

1   contentions, and to draw inferences therefrom, [the Ninth Circuit Court of Appeals] has held on

2   many occasions that summary judgment or judgment as a matter of law in excessive force cases

3   should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v.*

4   *County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) (explaining that the Court

5   has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the

6   jury."). This is because such cases almost always turn on a jury's credibility determinations.

7        First, it is necessary to assess the quantum of force used to arrest plaintiff. As the Ninth

8   Circuit Court of Appeals has explained, the three factors articulated in *Graham*, and other factors

9   bearing on the reasonableness of a particular application of force, are not to be considered in a

10  vacuum but only in relation to the amount of force used to effect a particular seizure. *Chew*, 27 F.3d

11  at 1441. Here, plaintiff focuses his allegations on two "uses" of force during his arrest: (1) the taser

12  strike after he broke free of Deputy Houck; and (2) kicks to the face after he had been tasered.

13  There is no dispute that Deputy Hanson tasered plaintiff at least once. There is also no dispute that

14  plaintiff was kicked in the face, either purposefully or by accident, which resulted in a broken jaw.

15       To this assessment of force, the Court must apply the *Graham* criteria, starting with the

16  "most important single element of the three specified factors: whether the suspect poses an

17  immediate threat to the safety of the officers or others." *Chew*, 27 F.3d at 1441. Here, there is

18  nothing in the record indicating that plaintiff was armed or that he posed an immediate threat to

19  anyone's safety. There is also evidence in the record that plaintiff was attempting to comply with

20  Deputy Hanson's orders, especially after he was tasered. Further, there are widely varying accounts

21  by the parties as to the actions taken by plaintiff prior to the time he was tasered. In light of these

22  facts, a rational jury could find that plaintiff posed no immediate safety threat to anyone.

23       The second *Graham* factor that the Court considers is the severity of the crime at issue.

24  *Graham*, 490 U.S. at 396. As noted above, the deputies had probable cause to arrest plaintiff for

25  obstruction. The Court agrees with defendants that the nature of the crime provides some basis for

26

MEMORANDUM ORDER
PAGE - 13

1    the deputies' use of physical force.

2        The third *Graham* factor is whether the individual actively resisted arrest or attempted to

3    evade arrest by flight.  *Id.*   On this record, there is no question that plaintiff initially attempted to

4    leave the scene.  However, there is much dispute over his actions once Deputy Houck began to

5    handcuff him, and after he broke free from those handcuffs.  In light of these disputed facts, a

6    rational jury could very well find that plaintiff was not attempting to flee from the scene and did not

7    need to be forcefully subdued.

8        Accordingly, the Court finds that the question of whether the force used in this case was

9    reasonable raises numerous issues of material fact that must be resolved by a jury.  Therefore,

10   summary judgment on this issue is not appropriate.

11       **E.  Qualified Immunity from § 1983 Claims**

12       Having determined that plaintiff's § 1983 claims for unlawful seizure and excessive force

13   during arrest will not be dismissed on summary judgment, the Court now turns to defendants'

14   qualified immunity argument.  Defendants argue that, even if the Court finds they violated plaintiff's

15   constitutional rights under the Fourth Amendment, they are protected by qualified immunity because

16   they reasonably believed that their actions were lawful in light of the clearly established law and

17   information they possessed at the time.  As further explained below, the Court disagrees.

18       Qualified immunity shields government officials, acting within one of their discretionary

19   functions, from civil liability as long as their conduct "does not violate clearly established

20   constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

21   U.S. 800, 818 (1982).  Once a government official raises the issue of qualified immunity, "the

22   plaintiff bears the burden of proving that the right allegedly violated was 'clearly established' at the

23   time of the occurrence at issue."  *Davis v. Scherer*, 468 U.S. 183, *reh'g denied*, 468 U.S. 1226

24   (1984).  To be considered "clearly established" for the purposes of qualified immunity analysis, "the

25   contours of the right must be sufficiently clear that a reasonable official would understand that what

26

MEMORANDUM ORDER
PAGE - 14

1   he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme

2   Court has directed that the inquiry into whether or not a claimed right was "clearly established" must

3   focus upon the right not in a general, abstract sense, but rather in a practical, "particularized" sense.

4   *See, id.* at 640. Likewise, the Ninth Circuit Court of Appeals has noted that "broad rights must be

5   particularized before they are subjected to the clearly established test," and the constitutional right

6   referenced in *Harlow*, *supra*, "is not a general constitutional guarantee . . . but its application in a

7   particular context." *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995).

8          The determination of qualified immunity also necessitates an inquiry into whether a

9   reasonable officer could have believed his particular conduct at issue was lawful under the

10  circumstances. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

11         In the instant case, the Court has declined to dismiss plaintiff's § 1983 claims. None of the

12  parties dispute that at the time of plaintiff's detention and arrest, he had a clearly established right to

13  be free from unlawful seizure, and the right to be free from the use of unreasonable force during any

14  arrest. However, as discussed above, there are unresolved factual issues at the heart of plaintiff's

15  claims.

16         Courts have struggled with the qualified immunity analysis on summary judgment when there

17  are issues of fact relevant to that analysis. *See Sloman v. Tadlock*, 21 F.3d 1462, 1467-69 (9th Cir.

18  1994). While the question of clearly established law is for the Court, it is the jury that is "best suited

19  to determine the reasonableness of an officer's conduct in light of the factual context in which it

20  takes place." *Id.* at 1468. The Court recognizes that the existence of a factual dispute is, of itself,

21  not a sufficient basis to deny summary judgment on a qualified immunity claim. *Saucier v. Katz*, 533

22  U.S. 194, 200 (2001). However, once the Court has concluded that plaintiff's facts would establish

23  a constitutional violation if proven true, and that the right violated is clearly established, the objective

24  reasonableness of the officer's conduct must be determined in light of the facts of the case. Those

25  facts are yet to be determined by a jury, and the final step of the qualified immunity analysis must

26

MEMORANDUM ORDER
PAGE - 15

1    await that determination.  Accordingly, as to plaintiff's § 1983 claims, the motion for summary

2    judgment on qualified immunity must be denied at this time.

3        **F.  Municipal Liability Claim**

4            The Court next turns to plaintiff's municipal liability claim against defendants King County

5    and the King County Sheriff's Office.  To establish municipal liability for failing to act to preserve

6    constitutional rights, city policy must cause a constitutional violation.  *Monell v. Department of*

7    *Social Services of City of New York*, 436 U.S. 658 (1978).  "It is only when the 'execution of the

8    government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §

9    1983."  *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting) (quoting *Monell*,

10   436 U.S. at 694).  The *Monell* Court emphasized that:

11           a municipality cannot be held liable solely because it employs a tortfeasor -- or, in
             other words, a municipality cannot be held liable under § 1983 on a *respondeat*
12           *superior* theory. . . .
                 . . .
13           Therefore, . . . a local government may not be sued under § 1983 for an injury
             inflicted solely by its employees or agents.  Instead, it is when execution of a
14           government's policy or custom, whether made by its lawmakers or by those whose
             edicts or acts may fairly be said to represent official policy, inflicts the injury that
15           the government as an entity is responsible under § 1983.

16   *Monell*, 436 U.S. at 691 and 694 (emphasis in original); *see also Collins v. City of Harker Heights*,

17   503 U.S. 115, 121 (U.S. 1992).  Therefore, the Court must first inquire whether there is a direct

18   causal link between a municipal policy or custom and the alleged constitutional deprivation.  *City of*

19   *Canton v. Harris*, 489 U.S. 378, 385-86 (1989).

20           Similarly, the Ninth Circuit Court of Appeals has explained that a policy is "'a deliberate

21   choice to follow a course of action . . . made from among various alternatives by the official or

22   officials responsible for establishing final policy with respect to the subject matter in question.'"

23   *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (*per curiam*) (citing *Oviatt v. Pearce*, 954 F.2d

24   1470, 1477 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  A

25   policy can be one of action or inaction. *See City of Canton*, 489 U.S. at  388.  Under *Canton*, a

26

MEMORANDUM ORDER
PAGE - 16

plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation. *Id.* at 387-89.  To impose liability against a municipality for its failure to act, a plaintiff must show: (1) that a city (or other municipality) employee violated the plaintiff's constitutional rights; (2) that the city has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights. *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003).

In the instant case, plaintiff vaguely alleges that defendants King County and the King County Sheriff's Department violated his Fourth Amendment rights by failing to supervise and train their deputies.  A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact. *See Canton*, 489 U.S. at 388.  The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy. *Id.* at 390.

In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Supreme Court discussed the circumstances under which inadequate training can be the basis for municipal liability. The first is a deficient training program, "intended to apply over time to multiple employees." *Id.* at 407 (citation omitted).  The continued adherence by policymakers "to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Id.* (citation omitted).  Further, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular

MEMORANDUM ORDER
PAGE - 17

1    incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 407-08 (citation omitted).

2         A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of

3    constitutional violations where "a violation of federal rights may be a highly predictable consequence

4    of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.*

5    at 409.  The *Brown* Court explained:

6            The likelihood that the situation will recur and the predictability that an officer
        lacking specific tools to handle that situation will violate citizens' rights could

7            justify a finding that policymakers' decision not to train the officer reflected
        "deliberate indifference" to the obvious consequence of the policy-makers' choice

8            – namely, a violation of a specific constitutional or statutory right.

9    *Id.*

10        Here, plaintiff primarily relies on a Blue Ribbon Panel Report, which this Court has declined

11   to consider.  Other than that report, plaintiff relies on statements made by Deputies Houck and

12   Hanson that they changed jobs to receive better work assignments and better training opportunities.

13   While that may be true, nothing about those statements indicates that any alleged constitutional

14   violations by the Deputies were caused by virtue of an unconstitutional policy or custom of King

15   County.  Nor does plaintiff provide any other evidence from which this Court can make such a

16   determination.  Accordingly, the Court finds that summary judgment in favor of defendants on this

17   claim should be GRANTED.

18       **G. State Law Claims**

19        Finally, the Court turns to plaintiff's state law claims.  The Court addresses each of them

20   separately.

21

22       *1. Battery*

23        Defendants first move for summary judgment on plaintiff's battery claim.  Defendants argue

24   that plaintiff's claim must fail because Deputies Houck and Hanson were privileged to use the force

25   they applied during plaintiff's arrest, and that force was reasonable.  Because the Court has not

26

    MEMORANDUM ORDER
    PAGE - 18

1  dismissed plaintiff's excessive force claim, there has been no determination as to whether the force

2  used was reasonable. Accordingly, the Court finds that summary judgment on plaintiff's battery

3  claim is not appropriate. *See Staats v. Brown*, 139 Wn.2d 757, 780 (explaining that qualified

4  immunity is not available for assault and battery claims arising out of excessive force claims).

5                          *2. False Arrest/Unlawful Imprisonment*

6         Defendants next argue that plaintiff's false arrest and false imprisonment claims are precluded

7  because they had probable cause for the arrest. Probable cause to arrest is a complete defense to an

8  action for false arrest and/or unlawful imprisonment. *McBride v. Walla Walla County*, 95 Wn. App.

9  33, 38, *rev. denied*, 138 Wn.2d 1015 (1999). Here, the Court has already determined that there

10 was probable cause to arrest plaintiff. Accordingly, summary judgment in favor of defendants on

11 plaintiff's false arrest/false imprisonment claim will be GRANTED.

12                        *3. Negligent Infliction of Emotional Distress*

13        Defendants next argue that plaintiff's claim for negligent infliction of emotional distress must

14 be dismissed as a matter of law. The Court agrees. Washington generally does not allow negligent

15 infliction of emotional distress claims against law enforcement officers. *Keates v. City of Vancouver*,

16 73 Wn. App. 257, 267-68, *rev. denied*, 124 Wn.2d 1026 (1994). Instead, courts require a plaintiff to

17 prove the elements of malicious prosecution. *Id.* In this case, plaintiff has not alleged malicious

18 prosecution, nor has he presented any evidence supporting such a claim. Accordingly, the Court

19 GRANTS summary judgment in favor of defendants on plaintiff's negligent infliction of emotional

20 distress claim.

21

22                     *4. Intentional Infliction of Emotional Distress/Outrage*

23        Defendants next argue that plaintiff's claim for intentional infliction of emotional distress

24 should be dismissed. Defendants recognize that the question of whether conduct is sufficiently

25 outrageous is generally a question for the jury. *See Seaman v. Karr*, 114 Wn. App. 665, 684 (2002).

26

MEMORANDUM ORDER
PAGE - 19

1   However, defendants argue that, in this case, reasonable minds could not differ about the conduct of

2   which plaintiff complains.  The Court disagrees.  As noted above, the Court has found that genuine

3   issues of material fact must be resolved pertaining to the reasonableness of the force used on plaintiff

4   during his arrest.  A reasonable jury may determine that the force used, especially the blows plaintiff

5   suffered to his face, was extreme and outrageous.  Accordingly, the Court finds that summary

6   judgment on this claim is not appropriate.

7        *5.  Negligent Supervision, Training, Hiring and Retention of Deputies*

8     Finally, defendants argue that plaintiff's negligent supervision claim should be dismissed.  In

9   Washington, courts have stated the elements of such a claim as follows:

10     A master is under a duty to exercise reasonable care so [as] to control his servant
       while acting outside the scope of his employment as to prevent him from

11     intentionally harming others or from so conducting himself as to create an
       unreasonable risk of bodily harm to them, if

12
13     (a) the servant

14     (i) is upon the premises in possession of the master or upon which the servant is
       privileged to enter only as his servant, or

15     (ii) is using a chattel of the master, and

16     (b) the master

17     (i) knows or has reason to know that he has the ability to control his servant, and

18     (ii) knows or should know of the necessity and opportunity for exercising such
       control

19     .
       Washington cases have generally interpreted the knowledge element to require a

20     showing of knowledge of the dangerous tendencies of the particular employee.

21  *Niece v. Elmview Group Home*, 131 Wn.2d 39, 51-52 (1997) (citations omitted).

22    In the instant case, plaintiff has produced no evidence that the Deputies were acting outside

23  the scope of their employment during plaintiff's arrest, or that King County or the King County

24  Sheriff's Department had knowledge of any dangerous tendencies.  Plaintiff also fails to produce any

25  evidence that King County or the King County Sheriff's Department knew or should have known

26

MEMORANDUM ORDER
PAGE - 20

1   that either of the Deputies were unfit and should not have been retained in their positions.

2   Accordingly, the Court agrees with defendants that plaintiff's claim must fail.

3   **III. CONCLUSION**

4        Having reviewed defendants' motion for summary judgment, plaintiff's opposition,

5   defendants' reply, the declarations and evidence in support of those briefs, and the remainder of the

6   record, the Court hereby ORDERS:

7        (1)  Defendants' motion for summary judgment (Dkt. #21) is GRANTED IN PART and

8   DENIED IN PART as follows:

9        a.  For the reasons set forth above, to the extent that plaintiff alleges that the initial pedestrian

10   stop violated his Fourth Amendment rights, the Court finds summary judgment in favor of

11   defendants is appropriate, and that claim is DISMISSED.

12        b.  For the reasons set forth above, to the extent that plaintiff alleges the scope of the stop

13   violated his Fourth Amendment rights, the Court finds that summary judgment in favor of defendants

14   is not appropriate, and that claim REMAINS to be resolved at trial.

15        c.  For the reasons set forth above, to the extent that plaintiff alleges his arrest violated his

16   Fourth Amendment rights, the Court finds that summary judgment in favor of defendants is

17   appropriate, and that claim is DISMISSED.

18        d.  For the reasons set forth above, the Court finds that summary judgment in favor of

19   defendants on plaintiff's excessive force claim is not appropriate, and that claim REMAINS to be

20   resolved at trial.

21        e.  For the reasons set forth above, the Court finds that summary judgment in favor of

22   defendants King County and the King County Sheriff's Department on plaintiff's claims for

23   municipal liability and negligent hiring, training, supervising, and retention is appropriate, and these

24   claims are DISMISSED.  Defendants King County and King County Sheriff's Department shall be

25   DISMISSED as defendants to this action.

26

MEMORANDUM ORDER
PAGE - 21

f.  For the reasons set forth above, summary judgment in favor of defendants on plaintiff's state law claims for battery and intentional infliction of emotional distress/outrage is not appropriate.

g.  For the reasons set forth above, summary judgment in favor of defendants on plaintiff's state law claims for negligent infliction of emotional distress and false arrest/false imprisonment is appropriate, and these claims are DISMISSED.

(2)  The Clerk shall forward a copy of this Order to all counsel of record.

DATED this _27__ day of June, 2007.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM ORDER
PAGE - 22